CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED

01/21/2026

LAURA A. AUSTIN, CLERK
BY: /s/ Tallulah Costa
DEPUTY CLERK

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| **KYLER LYONS**, on behalf of himself and all others similarly situated,<br><br>      Plaintiff,<br><br>      v.<br><br>**LIBERTY UNIVERSITY, INC.,**<br><br>      Defendant. | Case No. 6:26-cv-00007<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Kyler Lyons ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Defendant Liberty University, Inc. ("Liberty" or "Defendant") based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by his counsel and review of public documents as to all other matters:

### I.     INTRODUCTION

1. Education records are both sensitive and highly revealing. Thus, it is easy to understand why students value the confidentiality of those education records, particularly when it comes to their grades, chosen courses, and GPAs.

2. These privacy concerns are supported by the fact that educational information has long been highly regulated by both state and federal law, including the Federal Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, *et seq.*, which prohibits any regulated entity from disclosing personally identifiable education records to an unauthorized third party.

/ / /

3.      Liberty University is an accredited evangelical liberal arts university founded in 1971.[1]  In addition to its residential campus located in central Virginia, Liberty offers over 600 online degrees to students nationwide.[2]

4.      Liberty students are required to use myLU, Defendant's online student portal located at www.mylu.liberty.edu, and Liberty's learning management system located at www.liberty.instructure.com (collectively, the "Portal"). The Portal allows students to review their grades, enroll in courses, submit assignments, view information regarding their financial aid, and find jobs or internships, among other things.[3] Liberty also allows its students to submit "Prayer Requests" anonymously which are displayed online so that its religious student body and faculty may add the student to their personal prayers. Plaintiff enrolled as a Liberty student and used the Portal for some or all of these purposes, as described more fully below.

5.      Unfortunately, unbeknownst to Plaintiff and other Liberty students, Defendant does not keep its students' private academic information confidential. Instead, through the Portal, Defendant collected and transmitted sensitive, personally identifiable information from Plaintiff's and Class Members' education records to unauthorized third parties, including Meta Platforms Inc. ("Facebook"), Alphabet, Inc. ("Google"), and Microsoft Corporation ("Microsoft," and together with Facebook and Google, the "Tracking Tool Providers") through the use of surreptitious online tracking tools.

6.      The information that Liberty transmitted included highly confidential, personally identifiable information, such as Plaintiff's and Class Members' full names, registration status,

---

[1] *About Liberty*, LIBERTY UNIVERSITY, https://www.liberty.edu/about/ (last visited Jan. 13, 2026).
[2] *LU Online*, LIBERTY UNIVERSITY, https://www.liberty.edu/online-at-liberty/ (last visited Jan. 13, 2026).
[3] *myLU Portal*, LIBERTY UNIVERSITY, https://www.liberty.edu/information-services/products/mylu-portal/ (last visited Jan. 13, 2026); *Canvas: Your Learning Management Platform*, LIBERTY UNIVERSITY, https://www.liberty.edu/information-services/canvas/ (last visited Jan. 13, 2026).

course names and numbers, as well as the content of their prayer requests,[4] many of which include highly personal details about the student's personal struggles (collectively, the "Sensitive Information").

7.      Online advertising giants like the Tracking Tool Providers compile as much information as possible about American consumers, including information relating to the most private aspects of their lives, as fuel for their massive, targeted advertising enterprise. Thus, any information about a person captured by those online behemoths can be used to stream ads to that person.

8.      The Tracking Tool Providers offer website operators access to their proprietary suites of marketing, advertising, and customer analytics software, including Facebook's *Meta Business Suite* and *Facebook Ads* products; Google's *Google Analytics*, *Google AdSense*, and *Google Tag Manager* products; and Microsoft's *Microsoft Advertising*, *Bing Ads*, and *Xandr* products (collectively, the "Business Tools"). By using any of the Tracking Tool Providers' Business Tools, website operators can leverage the Tracking Tool Providers' enormous databases of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments to exploit.

9.      The Tracking Tool Providers' massive databases of consumer information can only exist with the help of users of the Business Tools, like Defendant. To use any one of the Tracking Tool Providers' Business Tools, a website operator must install the Tracking Tool Providers' internet user surveillance software onto their website, including tracking pixels ("Pixels") and cookies (collectively, the "Tracking Tools"). In other words, if a website operator wishes to use, e.g., Meta Business Suite, it must install Facebook's Tracking Tools onto its website. After being

---

[4] *See Prayer Requests*, LIBERTY UNIVERSITY, https://www.liberty.edu/prayer-request/ (last accessed Jan. 16, 2025) (showing highly personal nature of Liberty prayer requests).

installed, the Tracking Tools capture detailed information about every visitor to the website, which may include the specific webpages visited by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer. Moreover, this sensitive information often includes a unique identifier that the Tracking Tool Providers use to identify that user, regardless of what computer or phone is used to access the website.

10.     In essence, when website operators use the Tracking Tool Providers' Business Tools, they choose to participate in the Tracking Tool Providers' mass surveillance network and, in turn, benefit from the Tracking Tool Providers' collection of user data at the expense of their customers' privacy.

11.     As is clear from the amount of information that Liberty shares, it has chosen to prioritize its marketing efforts and profits over its students' privacy by installing the Tracking Tools on the Portal. Plaintiff and Class Members used the Portal and had their personal Sensitive Information tracked by Defendant using the Tracking Tools. Defendant **never** obtained authorization from Plaintiff or Class Members to share their Sensitive Information with third parties. Therefore, at all relevant times, Plaintiff and Class Members could not, and did not, provide informed consent for their Sensitive Information to be transmitted to the third parties, including to the largest advertisers and compilers of personal information in the world.

12.     Not only does this massive disclosure of information breach Plaintiff's and Class Members' reasonable expectations of privacy, but it constitutes a serious violation of FERPA and other state laws.

13.     As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with

4

educational providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Information; (vi) statutory damages and (vii) continued and ongoing risk to their Sensitive Information.

14.     Therefore, Plaintiff seeks, on behalf of himself and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: Invasion of Privacy; Negligence; Breach of Implied Contract; Unjust Enrichment; and violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq*.

## II.     PARTIES

***Plaintiff Kyler Lyons***

15.     Plaintiff Lyons is a citizen of the State of Arizona, residing in Maricopa County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

16.     Plaintiff Lyons was enrolled at Liberty from 2017 until May 2021, and re-enrolled for his master's program in March 2025. Plaintiff Lyons routinely used the Portal in the manner depicted in §IV(A)(iv), *infra* during his time as a student.

17.     Unbeknownst to Plaintiff Lyons, Defendant transmitted his Sensitive Information to unauthorized third parties through the Tracking Tools.

18.     Plaintiff Lyons never authorized Defendant to disclose any part of his student records, or other information provided to Defendant through the Portal.

19.     On every occasion that he used the Portal, Plaintiff Lyons possessed accounts with Facebook, Google, and Microsoft. In fact, Plaintiff Lyons registered for a Microsoft account because Liberty students were required to utilize Outlook for their student emails. Plaintiff Lyons accessed the Portal while logged into his Facebook, Google, and Microsoft accounts on the same device.

***Defendant Liberty University, Inc.***

20.     Liberty University is an accredited private university, with its principal place of business located at 1971 University Blvd, Lynchburg, Virginia.

### III.     JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because many putative class members are citizens of a different state than Defendant.

22.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

23.     This Court has personal jurisdiction over Defendant because its principal place of business is in this judicial district, and Defendant has otherwise made or established contacts in the State of Illinois and in this judicial district sufficient to permit the exercise of personal jurisdiction. and a substantial part of the unlawful events and practices which give rise to this action occurred in this District.

24.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

/ / /

/ / /

/ / /

/ / /

## IV.    FACTUAL ALLEGATIONS

**A.  DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES**

**i.    Facebook, Google, and Microsoft's Mass Advertising Surveillance Operations**

25.    Facebook operates the world's largest social media company, and the vast majority of its revenue comes from selling advertising space on its platform. In 2021, Facebook generated $117 billion, roughly 97% of which was derived from the sale of digital advertisements.[5]

26.    Facebook markets its Business Tools to website operators, claiming that its Business Tools can:

> [H]elp website owners and publishers, app developers, and business partners, including advertisers and others, integrate and share data with Meta, understand and measure their products and services, and better reach and serve people who use or might be interested in their products and services.[6]

27.    But website operators using Facebook's Business Tools must install Facebook's Tracking Tools on their website. Facebook readily admits that it "receives information from [third-party] businesses and organizations," such as Defendant, and uses that information to sell targeted advertising.[7] By way of example, Facebook's online *Help Center* explains that users "may see [Facebook] ads for hotel deals if [they] visit travel websites."[8]

/ / /

/ / /

/ / /

---

[5] *Meta Reports Fourth Quarter and Full Year 2021 Results*, META, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Jan. 13, 2026).

[6] *The Meta Business Tools*, FACEBOOK HELP CENTER, https://www.facebook.com/help/331509497253087?helpref=faq_content (last visited Jan. 13, 2026).

[7] *How Meta receives information from other businesses and organizations*, FACEBOOK HELP CENTER, https://www.facebook.com/help/2230503797265156/?helpref=related_articles (last visited Jan. 15, 2026).

[8] *Id.*

28.     Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[9] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[10]

29.     Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[11] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[12]

30.     Indeed, on its Privacy & Terms page, Google admits that it collects information from third party websites, stating that: "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[13]

/ / /

---

[9] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Jan. 13, 2026).

[10] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Jan. 13, 2026).

[11] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Jan. 13, 2026).

[12] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last visited Jan. 13, 2026).

[13] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last visited Jan. 13, 2026).

31.    Google also admits that it uses the information collected from third party websites, such as the Portal, to sell targeted advertising, explaining to users that: "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[14]

32.    Microsoft is the largest software company in the world, offering a diverse portfolio of product offerings including the Windows operating system, Office 365 software suite, LinkedIn professional social networking site, Xbox video gaming platform, as well as numerous targeted advertising products.[15] In 2024, Microsoft generated over $77-billion in revenue, including $12-billion derived from its advertising products.[16]

33.    Similar to Google and Facebook, website operators using Microsoft's Business Tools must install Microsoft's Tracking Tools on their website. Microsoft readily admits that it:

> generates a unique advertising ID for each person using a device, which app developers and advertising networks can then use for their own purposes, including providing relevant advertising in apps…Microsoft apps and third-party apps can access and use the advertising ID in much the same way that websites can access and use a unique identifier stored in a cookie. Thus, your advertising ID can be used by app developers and advertising networks to provide more relevant advertising and other personalized experiences across their apps and on the web.[17]

34.    Microsoft markets its Business Tools to website operators, claiming that that its Business Tools can "consolidate user behavior and uncover[] trends, so we can make your website better together for retail, content publishers, small business owners, and everywhere in between."[18]

---

[14] *Id.*

[15]    *Annual Report 2024*, MICROSOFT (Oct. 18, 2024)*, available online at*: www.microsoft.com/investor/reports/ar24/.
[16] *Id.*
[17]    *Microsoft Privacy Statement*, MICROSOFT, https://www.microsoft.com/en-us/privacy/privacystatement#mainadvertisingidmodule (last visited Jan. 13, 2026).
[18] *Clarity*, MICROSOFT, https://clarity.microsoft.com/ (last visited Jan. 13, 2026).

35.     While the Tracking Tool Providers admit that they collect information from third-party websites through the Tracking Tools, they do not provide, nor could they provide, a publicly available list of every webpage on which their Tracking Tools are installed. As such, the vague descriptions of their data collection practices referenced above could not give Plaintiff and Class Members any reason to think that Defendant was part of the Tracking Tool Providers' surveillance network. Moreover, as Defendant does not disclose its use of the Tracking Tools, Plaintiff and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Portal.

36.     The Tracking Tool Providers aggregate the user information that it collects from third-party websites into 'advertising profiles' consisting of all of the data that it has collected about a given user.[19] With these advertising profiles, the Tracking Tool Providers can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[20]

37.     The surveillance of individuals' internet usage through Tracking Tools is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report

---

[19] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[20] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last visited Jan. 13, 2026); *Facebook Ads: Who You Can Target*, SEOM Interactive, https://searchenginesmarketer.com/company/resources/facebook-ads-can-target/ (last visited Jan. 13, 2026); *Audience Targeting*, MICROSOFT ADVERTISING, https://about.ads.microsoft.com/en/tools/performance/audience-targeting (last visited Jan. 13, 2026).

"personal data to third-party tracking companies like Google[.]"[21] Google trackers are present on 74-percent of all web traffic.[22]

38.    Moreover, as in this case, the data collected through the Tracking Tools often pertains to the most personal and sensitive aspects of an individual's life. For example:

a. 93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[23] In fact, Google advertising trackers were found on 73-percent of pornography websites.[24]

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[25]

c. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[26] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[27]

---

[21] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Jan. 13, 2026).

[22] *WhoTracksMe*, Ghostery, https://www.ghostery.com/whotracksme/ (last visited Jan. 13, 2026).

[23] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[24] *Id*.

[25] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[26] Darius Tahir & Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last visited Jan. 13, 2026).

[27] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last visited Jan. 13, 2026).

39.     This monumental, invasive surveillance of Americans' internet usage is not accidental. In 2008, Facebook CEO Mark Zuckerberg predicted that the amount of information shared by individuals online will likely double every year, and Facebook's best strategy is to be "pushing that forward."[28] And in 2010, Google's then-CEO Eric Schmit admitted: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[29]

40.     In fact, the Tracking Tool Providers value user information so highly that it provides the Business Tools to many website operators for free, all to expand its extensive surveillance apparatus.[30]

41.     When website operators, like Defendant, make use of the Tracking Tool Providers' Business Tools, they are essentially choosing to participate in the Tracking Tool Providers' mass surveillance network, and in return they benefit from the Tracking Tool Providers' collection of user data, at the expense of their website users' privacy. For example, in exchange for allowing it to collect user information, Facebook allows website operators to target customers with "dynamic advertisements" personalized to individual consumers using the user information that Facebook collects from all across the internet.[31] Likewise, Google rewards website operators for providing

---

[28] Michael Zimmer, *Mark Zuckerberg's Theory of Privacy,* THE WASHINGTON POST (Feb. 4, 2014), https://www.washingtonpost.com/lifestyle/style/mark-zuckerbergs-theory-of-privacy/2014/02/03/2c1d780a-8cea-11e3-95dd-36ff657a4dae_story.html (last visited Jan. 13, 2026).

[29] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last visited Jan. 13, 2026).

[30] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 13, 2026) ("Google Analytics gives you the tools, free of charge").

[31] *Retargeting*, META, https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last visited Jan. 13, 2026).

it with their user's information by granting access to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[32]

42.    In many cases, a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[33] Even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[34]

43.    Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[35]

**ii.    Pixels Can Record Almost Every Interaction Between a User and a Website**

44.    In order to use the Tracking Tool Providers' Business Tools, Defendant installed the Tracking Tools, including tracking Pixels, onto the Portal.

45.    Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected

---

[32]    *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Jan. 13, 2026).

[33] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[34] *Id*.

[35] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POL. FOR THE INFO. SOC. (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[36]

46.     Pixels can collect a shocking amount of information regarding an individual's online behavior, including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the specific buttons and hyperlinks that the user clicks, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form.[37]

47.     But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[38]

### iii.     The Pixels Installed on the Portal Transmit Personally Identifiable Information to the Tracking Tool Providers.

48.     Every website is hosted by a computer "server" that holds the website's contents.

49.     To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet.  Each "client device" (such as a computer,

---

[36] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Jan. 13, 2026).

[37] *See id.*; Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited Jan. 13, 2026).

[38] *Lurking Beneath the Surface, supra* note 35.

tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

50.    Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

51.    Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[39] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[40] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[41]

52.    When a Facebook, Google, or Microsoft accountholder logs onto their account, their web browser records a tracking cookie.[42] These cookies include a specific line of code that links the web browser to the user's account with Facebook, Google, or Microsoft.[43]

/ / /

---

[39] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Jan. 13, 2026).

[40] *Id*.

[41] *Id*.

[42] Cyphers & Gebhart, *supra* note 18.

[43] *Id*.

53.    The Tracking Tool Providers' Pixels use cookies, but operate differently than cookies.  Rather than directing the browser to save a file on the user's device, the Pixels acquire information from the browser, without notifying the user.  The information can include details about the user, his or her interactions with the website, and information about the user's environment (e.g., type of device, type of browser, and sometimes even the physical location of the device).

54.    Simultaneously, the Pixels, like those installed on the Portal, request identifying information from any of the Google cookies previously installed on the user's web browser.

55.    The Pixel then combines the data it received from the browser with the data it acquired from the cookie, and instructs the web browser to transmit the information back to the Tracking Tool Providers. As a result, the Tracking Tool Providers can link all of the user information collected by their Pixels on the Portal to the user's identity, via the user's account or profile.  Thus, even if a user never actually logs into a website, or fills out a form, the website, along with the Tracking Tool Providers, can know the user's identity.

56.    A remarkable number of Americans possess a Facebook, Google, or Microsoft account. According to a 2023 survey, 68-percent of Americans report that they are users of Facebook.[44] One-third of Americans have accounts with Google's Gmail e-mail client, and over 80-percent of Americans use YouTube, Google's video client.[45] And approximately 230 million

---

[44] Katherine Schaeffer, *5 facts about how Americans use Facebook, two decades after its launch*, PEW RESEARCH (Feb. 2, 2024), https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last visited Jan. 13, 2026).

[45] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ ((last accessed Oct. 23, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last visited Jan. 13, 2026); Jeffrey Gottfried, *Americans' Social Media Use*, PEW RESEARCH (Jan. 31, 2024), https://www.pewresearch.org/internet/2024/01/31/americans-social-media-use/ (last visited Jan. 13, 2026).

Americans use Microsoft's Windows operating system.[46] When these users visit a website, like the Portal, that utilizes the Tracking Tool Providers' Tracking Tools, any information collected by the Pixels can be linked to the user's identity through the relevant cookies installed on the user's web browser.

57.    However, it is not only accountholders of the Tracking Tool Providers that are at risk of having Pixel-collected website data linked to their identities. Rather, the Tracking Tool Providers utilize sophisticated data tracking methods to identify even those few users who do not have accounts.

58.    The Tracking Tools, like those on the Portal, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

59.    An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[47] By tracking this browser fingerprint, the Tracking Tool Providers are able to compile a user's activity across the internet.[48] And, as Google continuously compiles user data over time, their understanding of the user's browser fingerprint becomes more sophisticated such that they need only collect a single piece of identifying information to identify the user linked to a browser fingerprint.

/ / /

/ / /

/ / /

---

[46] Medhi Rizvi, *How Many People Use Windows Worldwide*, TECH SEARCHERS (Apr. 15, 2025), How Many People Use Windows Worldwide - Tech Searchers (last visited Jan. 13, 2026).
[47] Cyphers & Gebhart, *supra* note 18.

[48] *Id*.

  iv. **Defendant Disclosed Plaintiff's and Class Members' Sensitive Information to Unauthorized Third Parties.**

60. To attend Liberty, Plaintiff and Class Members were required to use the Portal to register for classes, access course materials, view their grades, check their financial aid status, and complete various other administrative and academic functions.

61. Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Tracking Tools installed on the Portal to capture and transmit the Sensitive Information that they communicated to Defendant while using its student portal.[49]

62. The following screenshots ("Figures 1-2")[50] depict network transmissions made to Facebook by the Tracking Tools installed on the Portal. As Figures 1 and 2 show, when Liberty students perform routine tasks in the Portal, such as checking their course load, submitting assignments, or checking their grades, the information transmitted to Google by the Tracking Tools includes, in plain English, the student's full name, course titles and numbers, and past or future assignment names.

---

[49] The Portal's software is Canvas, a learning management software system sold by Infrastructure, Inc., but the installation of the Tracking Tools was solely performed by Liberty through custom CSS and Javascript files uploaded into the Canvas software by Defendant. *See Product Privacy Notice*, INFRASTRUCTURE, https://www.instructure.com/policies/product-privacy-policy (last accessed Jan. 16, 2025) ("If you are an end user of an Academic Institution or company that uses our Products, it means that your institution determines how your personal information is used"); *Canvas LMS Admin Guide*, INFRASTRUCTURE, https://community.instructure.com/en/kb/articles/661411-how-do-i-upload-custom-javascript-and-css-files-to-an-account (last accessed Jan. 16, 2025) (showing how custom code can be installed onto Canvas software).

[50] The Figures depicted in this Complaint were captured on Plaintiff's Portal accounts, and Plaintiff's Sensitive Information has been redacted to protect Plaintiff's privacy.



*Figures 1-2. Screenshots depicting back-end network traffic from the Portal, which show information transmitted to Facebook when students use various functions on the Portal.*

63.    The following screenshots ("Figures 3-6") depict network transmissions made to Google by the Tracking Tools installed on the Portal. As Figures 3-6 show, when Liberty students perform routine tasks in the Portal, such as reviewing their financial aid statuses, checking their course load, submitting assignments, checking their grades, or even submitting a prayer, the information transmitted to Google by the Tracking Tools includes, the student's course numbers, the term the student is taking or took a course, and whether the student is a current student or alumni.









*Figures 3-6. Screenshots depicting back-end network traffic from the Portal, which show information transmitted to Google when students use various functions on the Portal.*

64.     The following screenshots ("Figures 7-8") depict network transmissions made to Microsoft by the Tracking Tools installed on the Portal. As Figures 7-8 show, when Liberty students perform routine tasks in the Portal, such as checking their course load, submitting assignments, or checking their grades, the information transmitted to Microsoft by the Tracking Tools includes, in plain English, the student's full name, course titles and numbers, and past or future assignment names.

23



*Figures 7-8. Screenshots depicting back-end network traffic from the Portal, which show information transmitted to Microsoft when students use various functions on the Portal.*

65.     The following screenshot ("Figure 9") depicts network transmissions made to Google by the Tracking Tools installed on the Portal. As Figure 9 shows, Google Tracking Tools are present on the submission form used by students to submit their "Prayer Requests." When the form is submitted, the content of the Prayer Request is then shared to Google by the Tracking Tools, even when the student requests that their name and/or Prayer Request be kept anonymous.



*Figures 9. Screenshot depicting back-end network traffic from the Portal, which show information transmitted to Google when students use Prayer Request form.*

66.     Additionally, the Sensitive Information transmitted to the Tracking Tool Providers is accompanied by specific lines of code linking the Sensitive Information to Plaintiff. As shown in Figures 1-2, the Facebook Tracking Tools on the Portal transmit information alongside the identifier linked to Facebook's '_fbp' cookie, which identifies the user's Facebook account.

25

Figures 3-6 and 9 show the Google Tracking Tools on the Portal transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account. Figures 7-8 show that the Microsoft Tracking Tools on the Portal transmitted identifier numbers attached to Microsoft's 'MUID' cookie, which identify the user's Microsoft account. The Sensitive Information is further transmitted with information commonly used to make a browser fingerprint, including the user's operating system and version, browser software and version, screen resolution, and language.

67.    When they are installed on a website, by default the Tracking Tools record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an advertisement, or viewing a webpage. Defendant purposely configured the Tracking Tools on the Portal to collect and transmit additional user data, including the copious student record information depicted above.

**B. DEFENDANT DISCLOSED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT**

    **i.    Defendant failed to inform Plaintiff and Class Members of its disclosure of Plaintiff's and Class Members' Sensitive Information.**

68.    Defendant never informed Plaintiff or Class Members that it was sharing their personally identifiable Sensitive Information with third parties, including the Tracking Tool Providers.

69.    By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Sensitive Information.

/ / /

/ / /

26

70.    Despite never telling users like Plaintiff and Class Members, Defendant allowed third parties such as the Tracking Tool Providers to intercept Plaintiff's and Class Members' Sensitive Information and use it for advertising purposes.

**ii.    The Tracking Tools Used by Defendant Were Imperceptible to Plaintiff and Class Members**

71.    The Tracking Tools installed on the Portal were invisible to Plaintiff and Class Members. Without analyzing the network information transmitted by the Portal through examination of its source code or the use of sophisticated web developer tools, there was no way for a user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiff and Class Members, were unable to detect the Tracking Tools on the Portal.

72.    Plaintiff and Class Members were shown no disclaimer or warning that their Sensitive Information would be disclosed to any unauthorized third party without their express consent.

73.    Plaintiff and Class Members did not know that their Sensitive Information was being collected and transmitted to an unauthorized third party.

74.    Because Plaintiff and Class Members were not aware of the Tracking Tools on the Portal, or that their Sensitive Information would be collected and transmitted to the Tracking Tool Providers, they could not and did not consent to Defendant's conduct.

**C.    DEFENDANT WAS ENRICHED BY THEIR DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES**

**i.    Defendant Received Material Benefits in Exchange for Plaintiff's Sensitive Information**

75.    As explained, *supra*, users of the Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing the Tracking Tool Providers' Tracking Tools on their website.

76.     Upon information and belief, Defendant, as a user of the Tracking Tool Providers' Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing the Tracking Tool Providers to collect Plaintiff's and Class Members' Sensitive Information.

###   ii.    Plaintiff's and Class Members' Data Had Financial Value

77.     Moreover, Plaintiff's and Class Members' Sensitive Information has value, and Defendant's disclosure and interception of that Sensitive Information harmed Plaintiff and the Class.

78.     According to Facebook, another major internet advertiser, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[51]

79.     Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

80.     Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

81.     The unauthorized disclosure of Plaintiff's and Class Members' private and Sensitive Information has diminished the value of that information, resulting in harm including to Plaintiff and Class Members.

---

[51] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Jan. 13, 2026).

### D.  DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATES FERPA

#### i.    FERPA protects the confidentiality of education records.

82.    FERPA, 20 U.S.C. § 1232g, *et seq.*, and its implementing regulations govern the release of and access to "education records." *See* 20 U.S.C. § 1232(g); 34 C.F.R. Part 99.

83.    Under FERPA, "education records" are "those records, files, documents, and other materials which – (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A). The term "student" includes "any person with respect to whom an educational agency or institution maintains education records or personally identifiable information, but does not include a person who has not been in attendance at such agency or institution." 20 U.S.C. § 1232(g)(a)(6). Education records "include but are not limited to grades, transcripts, class lists, student course schedules, health records (at the K-12 level), student financial information (at the postsecondary level), and student discipline files."[52]

84.    Under the regulations implementing FERPA, "personally identifiable information" includes, but is not limited to: (a) the student's name; (b) the name of the student's parent or other family members; (c) the address of the student or student's family; (d) a personal identifier, such as the student's social security number, student number, or biometric record; (e) other indirect identifiers such as the student's date of birth, place of birth, and mother's maiden name; (f) other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in a school community who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty; and (g) information

---

[52]    *What is an education record?*, UNITED STATES DEPARTMENT OF EDUCATION, https://studentprivacy.ed.gov/faq/what-education-record (last visited Jan. 13, 2026).

requested by a person who the educational agency or institution reasonably believes knows the identity of the student to whom the educational record relates." 34 C.F.R. 99.3.

85.     Under FERPA, an educational institution or agency may not disclose personally identifiable information from a student's education records without signed and dated written consent, subject to exceptions not applicable here. *See* 34 C.F.R. 99.30-31.

### ii.     Defendant's use of the Tracking Tools violated FERPA.

86.     Plaintiff and Class Members, as past or present students enrolled at Liberty, are students of Liberty under FERPA. *See* 20 U.S.C. § 1232(g)(a)(6).

87.     The information disclosed to the Tracking Tool Providers through the Tracking Tools, which includes Plaintiff's and Class Members' course enrollment and financial aid status, are inarguably education records regulated by FERPA.

88.     Defendant's disclosure of these education records alongside Plaintiff's and Class Members' full names and cookie identifiers, without obtaining Plaintiff's and Class Members' consent, thus constitutes a violation of FERPA.

### E.  PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

89.     At all times when Plaintiff and Class Members provided their Sensitive Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Information with third parties for a commercial purpose.

90.     Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before an entity collects and shares that individual's data to be one of the most important privacy rights.

/ / /

91.     For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[53]

92.     Moreover, students are particularly concerned about data privacy with regards to student records. Indeed, one study found that students are less comfortable with their university sharing their data than they are of even Amazon sharing their data.[54] In explaining this finding, the researchers posited that "it may be that many are already aware of data sharing in a commercial context, but less aware, and potentially therefore, more disturbed by, data sharing in an educational context."[55] This is especially true given that federal and state laws, like FERPA broadly protect student information, and thereby create an expectation of privacy by students.

93.     Personal data privacy and obtaining consent to share Sensitive Information are material to Plaintiff and Class Members.

## V.     TOLLING AND ESTOPPEL

94.      Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation of the Tracking Tools onto the Portal.

95.     The Tracking Tools on the Portal were and are invisible to the average website visitor.

/ / /

---

[53] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Mar. 7, 2025).

[54] *See* Maina Korir, Sharon Slade, Wayne Holmes, Yingfei Héliot, Bart Rienties, *Investigating the dimensions of students' privacy concern in the collection, use and sharing of data for learning analytics*, COMPUTERS IN HUM. BEHAV. REP'TS (March 2023).

[55] *Id.*

96.     Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

97.     Plaintiff was ignorant of the information essential to pursue his claims, without any fault or lack of diligence on his part.

98.     Defendant had exclusive knowledge that the Portal incorporated the Pixels and other Tracking Tools and yet failed to disclose to students, including Plaintiff and Class Members, that by using the Portal, Plaintiff's and Class Members' Sensitive Information would be disclosed or released to unauthorized third parties, including the Tracking Tool Providers.

99.     Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its students' Sensitive Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to their students that they have disclosed or released their Sensitive Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

100.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

101.    The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## VI.     CLASS ALLEGATIONS

102.    This action is brought by the named Plaintiff on his behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

103.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

32

**The Nationwide Class**

All present or former students of Liberty University who used the Portal, and whose Sensitive Information was disclosed or transmitted to the Tracking Tool Providers or any other unauthorized third party.

104.    In addition to the claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of a separate Arizona Subclass, which is defined as follows:

**Arizona Subclass**

All present or former students of Arizona University who resided in Arizona at the time they attended Liberty University, who used the Portal, and whose Sensitive Information was disclosed or transmitted to the Tracking Tool Providers or any other unauthorized third party.

105.    Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

106.    Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

107.    **Numerosity**. The Class is so numerous that the individual joinder of all members is impracticable. On information and belief, there are at least 100,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

108.    **Commonality**. Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

33

a.      Whether and to what extent Defendant had a duty to protect the Sensitive Information of Plaintiff and Class Members;

b.      Whether Defendant had duties not to disclose the Sensitive Information of Plaintiff and Class Members to unauthorized third parties;

c.      Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Sensitive Information would be disclosed to third parties;

d.      Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Sensitive Information was being disclosed without their consent;

e.      Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

f.      Whether Defendant violated the statutes asserted as claims in this Complaint;

g.      Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

h.      Whether Defendant knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

i.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Information.

109.    **Typicality**. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

110.    **Adequacy**. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff

34

has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

111. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including the Tracking Tool Providers, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

112. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

113. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

114. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which

would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a) Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Information and not disclosing it to unauthorized third parties;

    b) Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Information;

    c) Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

    d) Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Sensitive Information would be disclosed to third parties;

    e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

    f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

115. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

**COUNT I**
**COMMON LAW INVASION OF PRIVACY**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Arizona Subclass)***

116. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 115 as if fully set forth herein.

117. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, highly personal Sensitive Information; and (2) making personal

decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiff's and Class Members' knowledge or consent.

118.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via the Portal and the communications platforms and services therein.

119.    Plaintiff and Class Members communicated Sensitive Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

120.    Defendant's interception and disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

121.    Plaintiff and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

122.    Defendant's disclosure and publicization of Plaintiff's and Class Members' Sensitive Information coupled with individually identifying information is highly offensive to the reasonable person.

123.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

124.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

125.    Plaintiff and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

126.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

127.    Plaintiff also seeks such other relief as the Court may deem just and proper.

## COUNT II
## NEGLIGENCE
### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Arizona Subclass)*

128.    Plaintiff repeats and realleges the allegations contained in in paragraphs 1 through 127 as if fully set forth herein.

129.    Through their enrollment as students of Liberty and use of the Portal, Plaintiff and Class Members provided Defendant with their Sensitive Information, believing such Information would be kept confidential.

130.    By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

131.    Defendant negligently failed to take reasonable steps to protect Plaintiff's and Class Members' Sensitive Information from being disclosed to third parties, without their consent, including to the Tracking Tool Providers.

132.    Defendant further negligently omitted to inform Plaintiff and the Class that they would use their Sensitive Information for marketing purposes, and/or that their Sensitive Information would be transmitted to third parties.

38

133.    Defendant knew, or reasonably should have known, that Plaintiff and the Class would not have provided their Sensitive Information to Defendant had they known that Defendant intended to use that Information for unlawful purposes.

134.    Defendant's conduct has caused Plaintiff and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Information accessed, stored, and disseminated without their knowledge or consent.

135.    Plaintiff and Class Members are entitled to compensatory, nominal, and/or punitive damages.

136.    Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Information of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

### COUNT III
### BREACH OF IMPLIED CONTRACT
#### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Arizona Subclass)*

137.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 136 as if fully set forth herein.

138.    When Plaintiff and Class Members provided their Sensitive Information to Defendant in exchange for enrollment of courses and use of the Portal, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose the Sensitive Information without consent.

/ / /

139.    Plaintiff and Class Members accepted Defendant's offers and provided their Sensitive Information to Defendant.

140.    Plaintiff and Class Members would not have entrusted Defendant with their Sensitive Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Sensitive Information without consent.

141.    Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Sensitive Information to third parties like the Tracking Tool Providers.

142.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

143.    Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially less for those services, had they known their Sensitive Information would be disclosed.

144.    Plaintiff and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

<u>**COUNT IV**</u>
**UNJUST ENRICHMENT**
*<u>(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Arizona Subclass)</u>*

145.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 144 as if fully set forth herein.

146.    Plaintiff pleads this claim in the alternative to their breach of implied contract claim.

147.    Plaintiff and Class Members conferred a monetary benefit on Defendant in exchange for educational services. Specifically, they provided their enrollment payments, as well as their Sensitive Information to Defendant which Defendant then utilized for marketing and advertising purposes, as described, *supra*.

148.    Defendant knew that Plaintiff and Class Members conferred a benefit upon them, which Defendant accepted. Defendant profited from the Sensitive Information of Plaintiff and Class Members by exchanging it for marketing and advertising services.

149.    In particular, Defendant enriched itself by obtaining the inherent value of Plaintiff's and Class Members' Sensitive Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiff's and Class Members' Sensitive Information.

150.    Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of its students' Sensitive Information.

151.    Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiff's and Class Members' Sensitive Information.

152.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their Sensitive Information, they would not have agreed to provide their Sensitive Information to Defendant.

153.    Plaintiff and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of direct money damages.

154.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer injury.

/ / /

/ / /

155.     Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

**COUNT V**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"),**
**18 U.S.C. § 2511(1), *et seq.***
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Arizona Subclass)***

156.     Plaintiff repeats and realleges the allegations contained in the paragraphs 1 through 155 as if fully set forth herein.

157.     The ECPA protects both sending and receipt of communications.

158.     18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

159.     The transmissions of Plaintiff's Sensitive Information to the Portal qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

160.     Electronic Communications. The transmission of Sensitive Information between Plaintiff and Class Members and the Portal with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

161.     Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

42

162.    Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

163.    Electronical, Mechanical or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.    Plaintiff's and Class Members' browsers;

b.    Plaintiff's and Class Members' computing devices;

c.    Defendant's web-servers; and

d.    The Pixel code deployed by Defendant to effectuate the sending and acquisition of the Sensitive Information.

164.    By utilizing and embedding the Pixels on the Portal, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

165.    Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to third parties such as the Tracking Tool Providers.

166.    Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Sensitive Information, including their course names, course numbers, and grades.

167.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason

43

to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

168.  By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

169.  Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

170.  The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

171.  Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiff and the Class.  However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Sensitive Information does not qualify for the party exemption.

172.  Defendant's acquisition of sensitive communications that were used and disclosed to the Tracking Tool Providers was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

    a.  Invasion of privacy;

    b.  Breach of Implied Contract; and

   c.   Violations of FERPA, 20 U.S.C. § 1232g, *et seq.*

173.   Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Sensitive Information on the Portal, because it used its participation in these communications to improperly share Plaintiff's and Class Members' Private Information with Google and other third-parties that (a) did not participate in these communications, (b) Plaintiff and Class Members did not know were receiving their Sensitive Information, and (c) Plaintiff and Class Members did not consent to receive their Sensitive Information.

174.   As such, Defendant cannot viably claim any exception to ECPA liability.

175.   Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

   a.   Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their Sensitive Information for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

   b.   Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' Sensitive Information without providing any value or benefit to Plaintiff or Class Members;

   c.   Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' Sensitive Information, such as understanding how people use the Portal and determining what ads people see online, without providing any value or benefit to Plaintiff or Class Members;

   d.   Defendant failed to provide Plaintiff and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Information; and

   e.   The diminution in value of Plaintiff's and Class Members' Sensitive Information and/or the loss of privacy due to Defendant making such Sensitive Information, which Plaintiff and Class Members intended to remain private, no longer private.

/ / /

176. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' Sensitive Information for financial gain.

177. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

178. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

179. Any purported consent that Defendant may claim to have received from Plaintiff and Class Members was not valid.

180. In sending and acquiring the content of Plaintiff's and Class Members' communications relating to their use of the Portal, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

181. As a result of Defendant's violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and other Class Members, pray for judgment against Defendant as follows:

A. an Order certifying the Nationwide Class and Arizona Subclass, and appointing the Plaintiff and his Counsel to represent the Classes;

B. equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Information of Plaintiff and Class Members;

C. injunctive relief requested by Plaintiff, including, but not limited to,

46

injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D.   an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.   an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.   prejudgment interest on all amounts awarded; and

G.   all such other and further relief as this Court may deem just and proper.

Dated: January 21, 2026                    Respectfully submitted,

*/s/ Ramon Rodriguez, III*
Ramon Rodriguez, III
**SIRI & GLIMSTAD, LLP.**
745 Fifth Avenue
Suite 500
New York, New York 10151
Telephone: (212) 532 1091
Email: rrodriguez@sirillp.com

Tyler J. Bean*
Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com
E: ssingh@sirillp.com

**pro hac vice admission anticipated*

47

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and other members of the proposed Classes, hereby demands a jury trial on all issues so triable.


Dated: January 21, 2026                                    Respectfully submitted,


                                                           */s/ Ramon Rodriguez, III*
                                                           Ramon Rodriguez, III